[No. 11418. Department Two. September 17, 1914.]

RICHARD H. LORD, *Respondent*, v. WAPATO IRRIGATION COMPANY *et al.*, *Appellants*.[1]

BROKERS — EMPLOYMENT — CONTRACT — TERMINATION. A contract employing brokers to purchase certain Indian allotments for an irrigation company is not terminated by the individual acts of representatives of the company, where the brokers did not consent to termination, nor waive any rights they might have under the contract.

ASSIGNMENTS—CONTRACT OF EMPLOYMENT — ABROGATION. Where a contract employing brokers to purchase Indian allotments for a corporation provided for stated commissions in case certain of the allotments were secured within a limited time through sources other than the efforts of the brokers, thereby recognizing possible failure as the result of their efforts, an assignment by one broker of his interests in the contract to the other, does not operate as an abrogation of the contract and bar recovery of commissions earned, it being conceded that the brokers acted in good faith and made honest effort to secure the allotments; since, although contracts calling for professional services requiring special qualifications are not assignable, the broker could assign his interests in the contract in so far as they were earned.

BROKERS — CONTRACT OF EMPLOYMENT — COMMISSIONS — RIGHT TO RECOVER—CONSTRUCTION. A clause in a contract limiting the price brokers were authorized to pay for certain Indian allotments, does not defeat the right to recover commissions under another clause of the contract providing therefor in case the allotments were secured within a limited time through sources other than the efforts of the brokers, resulting in larger commissions than if the brokers had been successful, the provisions being in no way dependent, and it being evident that the brokers desired compensation for their services whether successful or not, which the contract allowed sub-

[1]Reported in 142 Pac. 1172.

ject to the limitation imposed, it being conceded that the brokers
acted in good faith and made diligent effort to obtain the property
according to the terms of the agreement.

BROKERS—CONTRACT OF EMPLOYMENT—COMPENSATION—TIME FOR
PERFORMANCE—LIMITATION. Where a contract employing brokers
to procure certain Indian allotments provided that, when consents
to the sale of five of the allotments were obtained and delivered to
a corporation, it would pay to the brokers the compensation agreed
upon therefor, and provided in another paragraph of the contract
that in case the corporation secured title to three other allotments
through any source whatever within one year from the receipt of
deeds to the lands purchased under the first five allotments, the
brokers would receive $3,000 and a commission of seven and one-half
per cent, as though such consents and deeds had been secured
through their efforts, the limitation respecting the time for acquir-
ing title to the three allotments began to run from the date of the
final deeds to the five allotments, and not from the time consents
were obtained and delivered to the company.

SAME — TERMINATION OF CONTRACT — CONSTRUCTION. In such a
case, the fact that the corporation did not delay purchasing the
three allotments beyond the time agreed upon, thereby defeating
the brokers' claim for commissions, would not indicate that the con-
tract had been terminated, since the corporation was bound to exer-
cise good faith in performing the conditions imposed by the contract.

BROKERS—EMPLOYMENT—SALES BY OWNER—COMMISSIONS—VESTED
INTEREST. A broker is not entitled to recover commissions on a sale
of property by the owners thereof, on the ground that he had a
vested interest in the property created by a contract employing him
to obtain consent to purchase certain Indian allotments, and to sub-
sequently act as sales agent, the contract with reference to the ap-
pointment of selling agents providing that if the broker acted
promptly and faithfully, and the purchaser should put the property
on the market for sale, it would appoint the broker its sole agent
and pay commissions on sales made, since the agreement was a con-
tingent promise or option and inconsistent with the idea of a vested
interest.

ASSIGNMENTS — JOINT CONTRACT WITH BROKERS — COMMISSIONS—
TENDER OF PERFORMANCE. A contract employing brokers to secure
Indian allotments for a corporation, which provided that if the
brokers acted promptly and faithfully and the purchaser should put
the land on the market for sale, it would appoint them sole agents
and pay commissions on sales made, implies the rendition of serv-
ices, or tender of services, by both brokers, and a tender of perform-
ance by one broker, after assignment to him of the other's interest
in the contract, does not entitle the assignee to a recovery of com-

missions, since the contract involved services requiring special qualifications, and was not assignable without consent of the employer.

SAME—CONSENT TO ASSIGNMENT—RATIFICATION—EVIDENCE—SUFFICIENCY. In such a case, the evidence is insufficient to sustain a finding that the corporation consented to and ratified the assignment of the broker's interest in the contract to his co-employee and substituted the assignee as sales agent under the contract, where it appears that, dissatisfaction having arisen between the brokers, a consultation was had between the assignee, a director of the corporation and a third person relative to purchasing the assignor's interests, and an agreement had to that effect, whereupon the assignee purchased the interests with his own funds, the corporation not being a party to the agreement, and the majority of the directors thereafter refusing to consent thereto, that letters from the president of the corporation, while showing a desire to have the assignee's services as selling agent and a willingness to pay him the regular commission on sales made, were general in their statements and were such as would be sent to any agent, and that a conversation between the assignee and a director of the corporation was insufficient to justify the conclusion that the corporation ratified the assignment or substituted the assignee as sales agent.

PLEADING—ANSWER—INCONSISTENT DEFENSES—ESTOPPEL. Where an answer in an action on a broker's contract of employment, admitted an assignment by one broker of his interests under the contract to the other broker, but denied approval and ratification as alleged in the complaint, and as separate defenses, alleged abrogation of the contract and a full settlement of differences thereunder, and a breach of the contract and a demand for damages, the plea of settlement and demand for damages are not inconsistent defenses, since neither is necessarily false, and hence do not estop the defendant to deny approval and ratification of the assignment.

BROKERS—CONTRACT OF EMPLOYMENT—CONSTRUCTION. A contract employing brokers to procure consents to purchase certain Indian allotments is not absolute in providing that the brokers will procure one-third of the acreage in three of the allotments desired, thereby rendering them liable in damages for a breach thereof, but is an employment of the brokers to negotiate for the purchase of the lands, a performance on their part being an endeavor in good faith to procure the property; especially where the contract provided for the payment of commissions though the property be secured through sources other than the efforts of the brokers.

Appeal from a judgment of the superior court for Chelan county, Grimshaw, J., entered April 26, 1913, upon findings

in favor of the plaintiff, in an action for an accounting, tried to the court.    Reversed.

*Donworth & Todd* and *Reeves, Crollard & Reeves* (*Francis H. Brownell*, of counsel), for appellants.

*Dorr & Hadley* and *T. E. Cade*, for respondent.

FULLERTON, J.—This is an appeal from a judgment for the sum of $52,336.75, rendered by the superior court of Chelan county in favor of the respondent against the appellants, in an action for an accounting.

A somewhat extended statement of the facts is necessary to an understanding of the controversy. Prior to the year 1909, the appellant Wapato Irrigation Company was organized as a corporation under the laws of the state of Washington, for the purpose of engaging in a land and irrigation project in Chelan county. A large part of the lands it desired for its purposes were owned by Indians under allotments made to them pursuant to a statute of the United States enacted to carry into effect an agreement with them known as the Moses agreement. Under this statute, certain parts of these lands were alienable by the allottees under rules and regulations prescribed by the secretary of the interior department of the United States. The regulations in force in the early part of the year 1909 required a contemplating purchaser of such land to procure from the Indian allottee a written consent to a sale to the purchaser, whereupon, if the terms agreed upon therein were approved by the secretary, conveyances were made directly to the purchaser by the government on the payment of the agreed purchase price. The irrigation company, prior to the year named, had been unable to procure such consents, and was then desirous of engaging the services of some suitable and competent person to procure them for it. The land desired, when irrigated, was adapted to orchard growing, and it was the scheme of the irrigating company, should it obtain title

thereto, to provide for its irrigation, divide it into tracts of suitable acreage, and sell it as orchard lands.

In the early part of the year 1909, Lord and Brown were partners as real estate brokers, having an office at the city of Chelan, near the lands the irrigation company desired to purchase. Lord was well acquainted with the different Indian allottees, and could converse with them in a dialect which they well understood. He also had a thorough knowledge of the character of the Indians, their method of thought and manner of doing business, and was otherwise well qualified to deal with them. Brown was an experienced real estate broker, and had had large experience in the sale of orchard lands. Lord and Brown also owned a tract of land adjacent to the allotted lands, which they were desirous of selling. In March, 1909, the irrigation company sought to employ Lord to procure for them the consent of the Indians to sell so much of their lands as they were willing to and could lawfully alienate. Lord insisted that Brown be included in any agreement made with reference to the transaction, and after mutual negotiations, an agreement was entered into between Lord and Brown on the one part, and the irrigation company on the other. As this agreement is the basis of the present action, we set forth the same at length, omitting only the exhibit attached thereto and referred to therein; the exhibit being merely a description by metes and bounds of the different allotments sought to be purchased. It will be remembered, however, that the numbers placed before the different paragraphs do not appear in the original. They were inserted by counsel for convenience of reference, and we have included them for the same purpose. It may be well, also, to remark here that the appellant Chelan Land Company acquired an interest in the property subsequent to the execution of the agreement, and concedes itself liable to answer jointly with its co-appellant for any liability arising out of the agreement. The agreement follows:

"(1) This agreement, made and entered into this 27th day of March, A. D., 1909, by and between Richard H. Lord and Chas. F. Brown, parties of the first part, and the Wapato Irrigation Company, a corporation existing under and by virtue of the laws of the state of Washington, party of the second part,

"(2) Witnesseth: That whereas the party of the second part is anxious to buy as much as the United States will allow to be sold of the lands situate in Chelan County, State of Washington, and now contained in certain Indian allotments, more particularly described and set forth in Exhibit A, hereto attached and hereby made a part hereof.

"(3) And Whereas, the parties of the first part own in fee simple and hold under contract, certain lands adjoining the above mentioned Indian allotments, which they are anxious to sell.

"(4) And Whereas, The party of the second part believes it to be to its best interest to employ an agent or agents to negotiate the purchase of the above mentioned Indian lands.

"(5) And Whereas, The parties of the first part are well acquainted with the Indian allottees and heirs, and certain of their number can converse readily in the Indian tongue, and they are otherwise fitted, through many years of experience in the buying and selling of Chelan county lands, to act as agents in such a purchase.

"(6) Now, Therefore: The parties hereto agree together as follows: Upon the fulfillment of certain conditions hereinafter set forth, the parties of the first part agree to act as agents of the party of the second part in the purchase of the above mentioned Indian lands as hereinafter more particularly described, and for the prices hereinafter mentioned, and upon the terms and conditions hereinafter prescribed.

"(7) And the parties of the first part, for the considerations and percentages hereinafter set out, will act in good faith as agents for the said party of the second part in the purchase, as hereinafter outlined, of the above mentioned allotments, or as much as the allottees can be persuaded to sell, and until this agreement shall have been abrogated by mutual consent of both parties, the parties of the first part agree individually and collectively not to now or at any future

time bargain for nor purchase any portion of the above mentioned allotments as such, neither for themselves, nor for any other party whomsoever, other than for the Wapato Irrigation Company or its assigns; but they agree and promise to at all times assist and co-operate in all ways with the party of the second part to the end that it shall obtain title to as much as possible of said allotments as easily, as expeditiously and economically as possible, and to this end and for this purpose they agree that they will at once procure at their own cost and expense the written consent of the following named Indians to the sale of the land allotments held by them under Moses Agreement upon the terms and for the amounts as follows:

"(8)   Allotment number nine (9) in favor of Ustah, commonly known as Louis, a more specific description of which is found in Exhibit A hereto attached and made a part hereof, except that said Ustah is to keep and retain for his own use and benefit a certain tract or parcel of said allotment number nine (9) which shall not exceed one hundred (100) acres in extent, for the sum of Twelve Thousand Dollars ($12,000).

"(9)   Allotment number eleven (11) in favor of Tan-te-ak-o, commonly known as Johnny Abraham, a more specific description of which is found in Exhibit A hereto attached and made a part hereof, except that said Tan-te-ak-o is to keep and retain for his own use and benefit a certain part or parcel of said allotment number eleven (11) which shall not exceed one hundred (100) acres in extent, for the sum of Twelve Thousand Dollars ($12,000). It is agreed, however, that should said Tan-te-ak-o or Johnny Abraham keep and retain for his own use and benefit more than eighty acres of said allotment, then he is to receive a price which shall be less than said Twelve Thousand Dollars ($12,000) in proportion to the price per acre on the extra acreage retained by the said allottee.

"(10)   Allotment number thirteen (13) in favor of Ta-we-na-po, or Amena, a more specific description of which is found in Exhibit A, hereto attached, and made a part hereof, except that the allottee or his successors shall keep and retain for his or their own use and benefit a certain part or parcel of said allotment number thirteen (13), which shall not exceed one hundred (100) acres in extent, for the sum

of Six Thousand Dollars ($6,000). It is agreed, however, that should the said Ta-we-na-po or Amena or his successors, keep and retain for his or their own use and benefit more than eighty acres out of said allotment, then he or they are to receive a price which shall be less than Six Thousand Dollars ($6,000) in proportion to the price per acre on the extra acreage retained by the said allottee.

"(11)  Allotment number fifteen (15) in favor of Yo-ke-sil, a more specific description of which is found in Exhibit A hereto attached and made a part hereof, except that the said Yo-ke-sil is to keep and retain for her own use and benefit a certain part or parcel of said allotment number fifteen (15) which shall not exceed one hundred (100) acres in extent, for the sum of Eight Thousand Dollars ($8,000), it being understood and agreed that the hundred acres more or less commonly known as Willow Point shall not be retained by said allottee, and it being further understood and agreed that should said Yo-ke-sil keep and retain for her own use and benefit more than eighty acres out of said allotment, then she is to receive a price which shall be less than said Eight Thousand Dollars ($8,000) in proportion to the price per acre on the extra acreage retained by the said allottee.

"(12)  The south half of allotment number fourteen (14) in favor of Pa-a-na-wa or Pedoi, a more specific description of which is found in Exhibit A hereto attached and made a part hereof, except that the said allottee or his successors shall keep and retain for his or their own use and benefit a certain part or parcel of said allotment number fourteen (14) which shall not exceed fifty (50) acres in extent, for the sum of Four Thousand Dollars ($4,000). It is agreed, however, that should the said Pa-a-na-wa or Pedoi or his successors keep and retain for his or their own use and benefit more than eighty acres out of said allotment, then he or they are to receive a price which shall be less than Four Thousand Dollars ($4,000) in proportion to the price per acre on the extra acreage retained by the said allottee.

"(13)  The north half of allotment number fourteen (14) in favor of Pa-a-na-wa or Pedoi, a more specific description of which is found in Exhibit A hereto attached, and made a part hereof, except that the said allottee or his successors shall keep and retain for his or their own use and benefit a certain part or parcel of said allotment number fourteen

(14), which shall not exceed fifty (50) acres in extent for the sum of Four Thousand Dollars ($4,000). It is agreed, however, that should said Pa-a-na-wa or Pedoi, or his successors keep and retain for his or their own use and benefit more than eighty acres out of said allotment, then he or they are to receive a price which shall be less than Four Thousand Dollars ($4,000) in proportion to the price per acre on the extra acreage retained by the said allottee.

"(14)  The terms and conditions of said written consent in the case of each of said allotments shall be such as shall be approved by the Secretary of the Interior, one provision of which shall be for the furnishing of one and one-half (1½) acre feet or water per acre per season to each of the Indian allottees for the irrigation of the land retained by him or her out of said allotments, not to exceed eighty acres to any one allotment, One Thousand Dollars ($1,000), to be paid by said Wapato Irrigation Company upon the execution of this agreement, said One Thousand Dollars ($1,000) being advanced as expense money to be accounted for as is hereinafter provided, and when said consents shall have been procured and delivered to the said Wapato Irrigation Company, then the said Wapato Irrigation Company shall pay to the said Richard H. Lord and Chas. F. Brown the sum of Twenty-Five Hundred Dollars ($2,500) in cash as full and complete settlement and compensation for said services. And it is further understood and agreed that the Wapato Irrigation Company reserves to itself the right to decline to purchase any one or all of the allotments hereinbefore described and mentioned after said consents have been procured. But in case the said Wapato Irrigation Company shall decline to purchase said allotments said company shall forfeit to said Charles F. Brown and Richard H. Lord the said sum of One Thousand Dollars advanced as aforesaid for expense money.

"(15)  In the event the said Wapato Irrigation Company shall purchase said land, or any part thereof, under the consents so procured, the deeds to same to bear the approval of the Secretary of the Interior, then, upon the conveyance to it of the following described land, free and clear of all incumbrances, the title thereof to be a marketable title, and so shown by an abstract to be furnished therewith, to-wit: The northeast quarter of northeast quarter (NE¼ of NE¼) and lots four (4) and five (5) in section twenty-three (23)

and the southwest quarter of the northwest quarter (SW¼ of NW¼) section twenty-four (24) all in township twenty-eight (28) North Range twenty-one (21) East of the Willamette Meridian; and lots one (1) and two (2) in section twenty-three (23) township twenty-eight (28) North of Range twenty-one (21) East of the Willamette Meridian, all of the above land in Chelan county, Washington. And also upon the assignment to-wit, of that certain contract for the sale and purchase of lots six (6) and seven (7) in section twenty-three (23), the west half of the southwest quarter (W½ of SW¼) of section twenty-four (24) and lot one (1) of section twenty-six (26) all in township twenty-eight (28) North of range twenty-one (21) East of the Willamette Meridian in Chelan county, State of Washington, holden by Chas. F. Brown of one Walter N. Caswell and wife, executed on the nineteenth (19) day of January, 1909, said Wapato Irrigation Company will pay to the said Chas. F. Brown and Richard H. Lord the sum of Twelve Thousand Dollars ($12,-000) in cash, less the One Thousand Dollars ($1,000) heretofore advanced to them as expense money as hereinbefore provided.

"(16)   It is further agreed that the said Chas. F. Brown and Richard H. Lord will procure to be conveyed to the said Wapato Irrigation Company one-third of all the acreage in three certain allotments under said Moses Agreement; one made to Ne-quel-e-kin or Wapato John, being allotment number eight (8); one made to Que-til-qua-soon, or Peter, being allotment number ten (10); and one made to Ke-up-kin or Celesta, (commonly known as Sylvester) being allotment number twelve (12), and the said Wapato Irrigation Company agrees to pay said Chas. F. Brown and Richard H. Lord the sum of Three Thousand Dollars ($3,000) and seven and one-half per cent (7½%) of the purchase price of said lands as commission for said purchase, and said Wapato Irrigation Company reserves to itself the right to determine whether or not it will accept and pay for said lands after said Chas. F. Brown and Richard H. Lord have secured the consents of the said allottees to the sale thereof; and should said Wapato Irrigation Company decide after said consents have been obtained not to purchase said lands, they agree to pay said Chas. F. Brown and Richard H. Lord the sum of

three thousand dollars ($3,000) in full and complete compensation for their services in the matter.

"(17)   Said Chas. F. Brown and Richard H. Lord further agree that they will honestly and diligently, acting at all times in good faith, endeavor to procure all of the lands in the three allotments hereinbefore described except so much of each allotment as is by law necessary to be retained by the said Indian allottees and the Wapato Irrigation Company agrees to pay to the said Chas. F. Brown and Richard H. Lord in the same manner and in the same amounts for the land so procured as is previously provided, in case they secure only one-third of each of the three allotments, and the said Wapato Irrigation Company agrees that after the deeds have been procured to the first five allotments hereinbefore mentioned, that they will advance to the said Chas. F. Brown and Richard H. Lord the sum of One Thousand Dollars ($1,-000) to be merely advanced and to be repaid to the said Wapato Irrigation Company out of the commission on said purchase price of said lands due said Chas. F. Brown and Richard H. Lord upon the obtaining the deeds of the three allottees above named.

"(18)   It is further agreed that the purchase price to be paid for said allotments, unless otherwise agreed, shall be as follows: for allotment number eight not to exceed the sum of Fifty Dollars per acre; for allotment number ten (10) not to exceed the sum of Fifty Dollars ($50) per acre; and for allotment number twelve (12) not to exceed the sum of twenty-five Dollars ($25) per acre.

"(19)   It is further agreed that in case said Wapato Irrigation Company shall secure title to any of said three allotments, eight (8), ten (10) and twelve (12), through any source whatever within one year from the date of the delivery of deeds to the Wapato Irrigation Company of lands purchased in the first five allotments above mentioned the said Wapato Irrigation Company shall pay to the parties of the first part the said Three Thousand Dollars ($3,000) and the said seven and one-half per cent (7½%) commission as above indicated the same as if the said consent and deeds had been secured through said parties of the first part.

"(20)   If the said Wapato Irrigation Company shall acquire title to the lands in this instrument above described and specified as being its purpose to secure, or any part

thereof, said Chas. F. Brown and Richard H. Lord acting promptly and faithfully therein, and shall place the same upon the market for sale, it will appoint as its sole and only agents for that purpose in the cities of Chelan and Wenatchee, said Chas. F. Brown and Richard H. Lord, the property to be listed to them at the lowest price at which said lands may be sold by any agent, and to pay them a commission of five per cent (5%) upon the total sales, and five per cent (5%) additional commission upon the amount of sales made by them, the commission to be paid in the following manner: Four-fifths (4-5) of the commission to be paid when one-fifth (1-5) of the purchase price is paid to the Wapato Irrigation Company, and the remaining one-fifth (1-5) of the commission to be paid when two-fifths (2-5) of the purchase price has been paid to the Wapato Irrigation Company.

"(21)    Said Chas. F. Brown and Richard H. Lord, as such agents, agree that they will at their own proper cost and expense, procure all necessary local advertising; that they shall have open for inspection a properly kept set of books, outlining the doings of their agency, which shall at all times be open to the inspection of the Wapato Irrigation Company, its officers, or representatives, it being understood that the Wapato Irrigation Company shall furnish to Messrs. Brown and Lord, proper advertising matter, and do such general advertising as it may see fit, and that they shall do all advertising to be done in the city of Seattle, Washington.

"(22)    In Witness Whereof, the parties of the first part have hereunto set their hands and seals, and the party of the second part has signed these presents by its vice-president and secretary, and has caused its corporate seal to be attached hereto, on this 27th day of March, A. D. 1909."

Immediately after the execution of the agreement, Lord and Brown entered upon its performance. In due time they procured consents of the Indians to portions of allotments numbered 9, 11, 13, 14, mentioned in paragraphs 8, 9, 10, 12 and 13 of the agreement, and a portion of allotment numbered 12, mentioned in paragraph 16. These consents were approved by the interior department and conveyances were made to the irrigation company for the lands described there-

in. The company also purchased of Lord and Brown the lands described in papagraph 15 of the agreement, paying therefor the agreed purchase price. It also paid the commissions and percentages agreed to be paid for obtaining the consents to the allotments enumerated as procured, and no dispute arises in this action as to the sufficiency of·these payments.

On December 10, 1910, Brown assigned all his interests in the contract to Lord, and since that time has not further participated in any of the matters pertaining to it. On the 23d of the same month, Lord met with the directors and stockholders of the company at Seattle, and there announced his inability to procure any part of allotments 8 or 10, mentioned in paragraph 16 of the agreement, at the prices named in the agreement. The directors of the company thereupon took steps to procure the consents through another source, and after due time did procure them through the interior department, although at a large expense and at prices considerably in excess of the prices named in the agreement. The title to the property was secured within one year from the date of the deeds to the land purchased which lay within the five allotments previously mentioned, and Brown and Lord claimed the commissions and percentages agreed to be paid for procuring the same, basing their claim on paragraph 19 of the agreement. The purchasers, however, refused to recognize the claim, and the right to recover these sums is one of the disputed questions in the present action.

Of the lands described in the agreement, the irrigation company acquired 4,197.21 acres. It also acquired various other tracts in the same vicinity, some of which it acquired through Lord and Brown, but under agreements not connected with the agreement here in suit, its total holdings so acquired aggregating some 7,000 acres. In the summer of 1911, it platted into orchard tracts a portion of the lands, and put the platted portions upon the market for sale, tendering to Lord a general agency for their sale at scheduled

prices, at a commission of five per cent on the purchase price. Lord concededly made one sale for which a commission of five per cent was tendered him. This commission Lord refused to accept, contending that, under the agreement, he was entitled to a commission of ten per cent. He also claims to have made, and the court found, that he was the procuring cause of one additional sale. The correctness of this finding is in dispute on this appeal. On September 20, 1911, the appellants entered into a contract of sale with Swalwell & Swartout, a corporation, by the terms of which the appellants agreed to sell, and the corporation agreed to purchase, 5,000 acres of the appellants' holdings, at a price of $200 per acre, payable in annual installments of $200,000 each, commencing with December 1, 1912. By the terms of the contract, the lands could be selected from any part of the appellants' holdings by the purchaser; those acquired through sources other than the agreement with Brown and Lord, as well as those acquired within the agreement. No part of the purchase price was paid at the time of the execution of the contract.

Prior to this last mentioned sale, the irrigation company had conveyed to certain of its stockholders 115.84 acres of the land (called in the books of the company a dividend), which it charged to them at the rate of $200 per acre. It had also sold to sundry other persons lands aggregating in quantity 39.27 acres, at a price of $15,344. The sales found by the court to have been made by Lord aggregated 10.54 acres, and were sold for the sum of $3,212.

This action was instituted by Lord alone; he claiming the sole beneficiary interest under the contract in virtue of the assignment made to him by Brown. His first claim is for the commissions and percentages on the purchase of allotments 8 and 10, mentioned as acquired by the appellants through the intercession of officers of the interior department. His second claim is for commissions as selling agent, under paragraphs 20 and 21 of the agreement, his contention being

that, under that part of the agreement, he is entitled to a commission of 10 per cent on all lands sold through his own procurement, and five per cent on all sales made by the company through its own efforts or through the efforts of other agents. The trial court decided in his favor on both claims, awarding him $6,000 on the first, and $42,572.40 on the last, with interest on the first sum from the date of the procurement of the property, and on the latter from the dates of the respective sales.

The record is voluminous and it would be unprofitable to attempt a review of it here at length. Our examination of it convinces us that it justified the conclusion of the trial judge that the respondent is entitled to recover the stipulated commissions on the purchase of allotments 8 and 10. Against this holding the appellants make four principal contentions: (1) that the agreement was terminated as to these purchases, as well as in all other respects, at the Seattle meeting of December 23d, 1910; (2) that the entire agreement was abrogated by the assignment from Brown to Lord; (3) that the land was not purchased by the appellants at the price limited in the agreement with Brown and Lord; and (4) because there was a modification of the contract, or, perhaps better, a construction put upon the contract by Lord, at a meeting held in Wenatchee, Washington, at which time he demanded and received compensation for procuring consents for the first five allotments, which fixed the time for the running of the one-year period, and the allotments in question were not procured by the company's efforts within one year from that time.

As to the first proposition, we cannot agree that the agreement was terminated in its entirety at the Seattle meeting mentioned. Doubtless the appellants' representatives terminated and abrogated it as far as they could do so individually, but it is equally clear that Lord did not consent to such abrogation. While he was paid and while he accepted such sums as were due under the contract up to that time, he

did not waive his right to any sum that thereafter might become due.

The claim that the contract was abrogated in its entirety by the assignment of Lord to Brown we think is equally without merit. It is, as we hereafter show, a well settled principle of law that contracts which call for professional personal services requiring special qualifications or skill, are not assignable by the person who has undertaken to perform the services, but Brown could assign his interests in the contract in so far as they were earned, and we think that the interests now in question were so earned. It is not questioned that Brown and Lord acted at all times in good faith, and made an honest and diligent effort to secure the consents. Their efforts failed because the Indians would not sell at the prices they were permitted to offer. That it was thought possible that failure might be the result of the negotiations is made clear by the clause of the contract which provides for the payment of stated commissions in the case the company should secure title to the property through some other source than the efforts of the brokers. No such provision was inserted with reference to any of the other allotments. Its insertion with reference to these must have been for some purpose; and it would be difficult to conceive of a purpose if it were not thought that failure might result notwithstanding the efforts of the brokers. It must follow, we think, that the commission was earned under the contract in so far as performance by the brokers was concerned. Their right to payment was dependent, of course, on the ability of the company to secure title from some other source within the time limited, but clearly the assignment under such circumstances did not bar the right to recover if the property was procured within that period.

Nor do we think the clause in the agreement limiting the price Lord and Brown were authorized to pay for the property in any way affected the brokers' right to recover under this particular clause. The two are in no way made depend-

ent, and it is not reasonable to suppose that it was thought that the company could, through some other source, purchase the property at the prices named in the agreement should the brokers fail to purchase it at that price. To our mind the more reasonable construction is that the brokers desired compensation for their services whether the same were successful or unsuccessful, and the company was willing to allow the compensation subject to the limitation imposed. True, the compensation of the brokers proves to be greater under the existing conditions than it would have been had the brokers succeeded in their efforts, but it is a sufficient answer to any objection based on this fact to say that such is the language of the agreement. Had the brokers not acted in good faith a different question would have been presented. But there is no question on this score. As we say, it is conceded on all sides that they acted honestly and diligently, and made a good faith effort to obtain the property according to the terms of the agreement.

The Wenatchee meeting, thought to fix the time when the one-year limitation period began to run, was held on April 13, 1909. Prior to that time the brokers had procured written consents for the sale of allotments 9, 11, 13, and 15, and had notified appellants to that effect. The consents for the sale of allotment 14 had not then been obtained, not that its owners had refused to sell, but, because of their number and complex interests, negotiations with them had not been concluded. The appellants, however, desired to present the consents obtained at once to the secretary of the interior at Washington for his approval or rejection, and the meeting was arranged that the appellants counsel might inspect them, and if found satisfactory, carry them to Washington. At the meeting the brokers insisted that, by the terms of the agreement, they were entitled to the compensation provided therein for procuring the consents at the time of their delivery. On its being objected that the consents for allotment 14 had

19—81 WASH.

not then been obtained, and further that the compensation
was not due until they had been approved by the secretary,
they refused to deliver up those that had been obtained, pre-
ferring to hold them until the negotiations for allotment 14
had been completed. After some further consideration, the
appellants paid the compensation, when the consents then ob-
tained were delivered to them. It was claimed by the appel-
lants, and they offered to show, that a modification of the
agreement was there made, by which the consent for allotment
12 was substituted for allotment 14, but the trial court ruled
the evidence inadmissible. No evidence was offered, how-
ever, tending to show that the agreement was modified with
respect to the time the limitation period began to run, fur-
ther than the mere agreement to substitute the one allotment
for the other would affect that period. It is our opinion that
the facts admitted do not justify the claim that the limita-
tion period began to run at that time, nor would the result
be changed were we to consider it as proven that the claimed
substitution was made. In paragraph 14 of the agreement it
is provided that "when said consents [meaning the consents
for the first five mentioned allotments] shall have been pro-
cured and delivered to the said Wapato Irrigation Company,
then the said Wapato Irrigation Company shall pay to the
said" brokers the compensation therein contracted for. The
language fixing the time when the limitation period shall
begin to run is (paragraph 19 of the agreement) "within
one year from the date of the delivery of deeds to the Wapato
Irrigation Company of lands purchased in the first five allot-
ments above mentioned." It was known to the parties, at
the time of the execution of the agreement, that the approval
of the secretary of the interior could not be obtained and
deed delivered immediately upon the delivery by the brokers
of the consents to the irrigation company, but that some
time must elapse between the two events. Having this knowl-
edge, it seems to us that it would be a perversion of the di-
rect language of the contract to hold that the parties by

naming the latter event meant the former.  Since the title to lots 8 and 10 were obtained within one year from the date of the final deeds to the first five allotments, we cannot conclude that the limitation period had run.  But counsel say:

"We have already pointed out that appellants, by postponing closing the John and Peter purchases sixty days from the actual time that they acquired them, March 27, 1911, could have avoided this whole claim for commission on these allotments.  The fact that appellants did not wait is the best proof in the world that they considered the written agreement fully terminated and finished."

But we cannot think the premise here assumed a basis on which liability could have been avoided.  The appellants, as well as the brokers, were obligated to exercise good faith in the performance of the conditions imposed upon them by the agreement, and, clearly, it would not have been the exercise of good faith to have delayed action in acquiring the deeds for the sole purpose of avoiding this liability.

The respondent is also entitled to recover a commission on the sales found by the trial court to have been made by him subsequent to the time the lands were placed upon the market for sale.  As to one of these, known as the McCarten sale, there is no dispute, it being conceded by the appellants that he was the procuring cause of the sale.  As to the other, the Finch sale, there is a dispute as to whether he was the procuring cause of the sale, but we are not able to say that the evidence concerning it preponderates against the finding of the trial court.  Our conclusion is, however, that he is entitled to a five per cent commission on these sales, not a ten per cent commission as the trial court found.  Our reasons for the conclusion will appear in the discussion of the succeeding propositions.

As to the sales found by the court to have been made by the appellants themselves, we think the court erred in finding that the respondent was entitled to a commission upon them. The first contention made in support of the finding is that

the respondent has a vested interest, in virtue of the terms of the agreement, in the property to the value of such commissions. It is our opinion that the agreement does not bear this interpretation. The clauses of the agreement having reference to selling agents is found in the paragraphs thereof numbered 20 and 21. Paragraph 20 provides that if the appellants shall acquire title to the lands described in the agreement as being its purpose to secure, or any part thereof, "said Charles F. Brown and Richard H. Lord acting promptly and faithfully therein," and the purchaser shall put the land upon the market for sale, "it will appoint as its sole and only agents for that purpose in the cities of Chelan and Wenatchee said Charles F. Brown and Richard Lord . . . and pay them a commission of five per cent (5%) upon the total sales, and five per cent (5%) additional commission upon the amount of sales made by them, . . ." It will be observed that there is here no present creation of an agency for selling the lands as there is in the preceding part of the agreement for purchasing the lands. The agreement is in the nature of a promise to appoint. It was made to depend upon two stated contingencies, namely, that the brokers acted "promptly and faithfully therein," and that the purchasers should place the property upon the market for sale. The latter contingency depended absolutely upon the will of the purchasers. They were at liberty to withhold the lands from the market if they so chose without incurring liability to the brokers. This privilege or option is utterly inconsistent with the idea of a vested interest. "A vested interest can mean nothing else than an interest in respect of which there is a fixed right of present or future enjoyment." *Stewart v. Harriman*, 56 N. H. 25, 22 Am. Rep. 408. A promise, made subject to a contingency dependent upon the will of the promisor, does not create such an interest, and the promise here made was so subject. Therefore, there is nothing in the agreement itself, we conclude, that vests in the broker a

right to commissions on sales made of the lands by the purchasers themselves.

There is another reason, also, which we think fatal to the right of the respondent to recover the commissions here claimed. There has been no performance, or tender of performance, by the brokers of the selling agency clause of the agreement. It will be observed that the brokers were to have the sole and exclusive agency for the sale of the lands at the cities of Chelan and Wenatchee. These cities, the evidence shows, were the places at which the principal sales of the property would be made. This clearly contemplated that the brokers were to render services in some degree commensurate with the compensation they were to receive. Even if the agreement, under any construction of its terms, vested in the brokers a right to commission on the entire sales, it could be so only in the case the brokers performed, or tendered performance, of its conditions in their entirety. They could not perform in part only, refuse to perform in another, and still receive the commission. Now, if any tender of performance was made at all, it was made by the respondent alone. But he could not perform individually. The agreement does not contain a promise to appoint either of the brokers individually as a selling agent, but the promise is to appoint them jointly. The other party to the contract was entitled to the services of both brokers, and a tender of performance by one then was not a compliance with the imposed conditions. Moreover, a contract to perform services of this nature is not assignable by the person agreeing to perform the service, without the consent of the other party. The services involved required special qualifications and fitness, and were not delegable as of right by one of the parties to the other. *Bleecker v. Satsop R. Co.*, 3 Wash. 77, 27 Pac. 1073; *Deaton v. Lawson*, 40 Wash. 486, 82 Pac. 879, 111 Am. St. 922, 2 L. R. A. (N. S.) 392.

But the respondent contends, and the trial court seems to have found, that the assignment from Brown to the re-

spondent was made with the approval and consent of the appellants, and that the appellants recognized the respondent's right to act individually, not only by actually appointing him as selling agent, but by their answer to the complaint in the case at bar. In our view of the record, however, these contentions are not justified by the evidence. The contention that the assignment was made with the approval and consent of the appellants is founded upon certain transactions had immediately before and immediately succeeding that event. It appears that Brown and Lord were "having trouble" between themselves, and that one Bissett, an attorney at law, who had at times performed legal services for the appellants, and one Swalwell, a director in the appellant companies, consulted with Lord about the desirability of purchasing Brown's interests and forming a corporation to take the selling agency of the lands, and a tentative agreement was had between them to that effect. Lord thereafter purchased Brown's interests, paying the consideration therefor out of his own funds. But, without further detailing the transaction, we think it demonstrated that this was merely a personal arrangement and understanding between the parties themselves, with which the appellants had nothing to do; that Bissett was acting in his own interests, not for the appellants, and that Swalwell's participation therein was subject to the approval of his co-directors. When the scheme was broached to the other directors, a majority of them refused to consent to the arrangement, and no further effort was made to carry it into effect.

The contention that the appellants are estopped by their answer to deny approval and ratification of the assignment is equally without foundation. In his complaint the respondent set forth the assignment of Brown to himself, and averred that it was made with the consent and approval of the appellants, and was subsequently ratified by them. The appellants, in their answer, admitted the assignment, but denied the other allegations averred concerning it. They also, by

way of a separate defense, set up an abrogation of the contract by the mutual consent of the parties, and a full settlement of all matters and differences growing out of the same. By a second separate defense, they pleaded a breach of the undertaking to procure consents to the sale of the land in allotments 8 and 10, and, by reason of such breach, they were delayed in the prosecution of the enterprise, were compelled to procure the land through other sources, at a great expense to themselves, and at a price in excess of that at which the brokers agreed to procure the property, to their damage in a large sum of money, for which they demand judgment against the respondent. Concerning this, counsel say:

"They first plead no contract and then proceed to specify damages and demand judgment under the contract, the effect of which is to render their pleading of no force, as an answer on this point. The two positions are so absolutely inconsistent that neither can stand; the proof of the one would necessarily destroy and disprove the other, and vice versa. There is therefore no issue raised in the case upon plaintiff's averment that the Brown assignment was taken by plaintiff with the full knowledge, consent, acquiescence and subsequent ratification of both of defendants."

But, as we view it, there is no inconsistency in the plea of abrogation of the contract and the demand of damages for a breach of its conditions. The inconsistency lies in the fact that a demand of damages is made after a plea that the parties setted their differences in full. It could well be that a party could recover damages for the breach of a contract, even after it had been abrogated by mutual consent, but no recovery could be had for a breach after the parties had settled their differences in full. But this is not the inconsistency aimed at by the rule on which the respondent relies. The rule is intended to prevent false swearing and perjury. In a court of justice, where truth is the result sought, a party cannot be heard to testify that certain statements of fact are true in support of one branch of his case, and deny their

truth in support of another. But defenses are inconsistent only when one of them is necessarily false. Here no such condition is presented. It can be true that the appellants have been damaged by a breach of the contract on the part of the brokers, and that the parties have had a full and complete settlement of the matters arising out of the breach. A witness testifying to both state of facts will not subject himself to the pains and penalties of perjury. The appellants, of course, cannot, in the final judgment, have the benefit of both the settlement and the counterclaim. But they may consistently plead both, and may have the benefit of the settlement, if in the judgment of the court their proofs sustain the plea of settlement; or, failing in that, may have a judgment in damages, if their proofs sustain the plea of damages.

The contention that the appellants actually appointed the respondent as selling agent under the provision of the agreement is founded upon letters passing to the respondent from the president of the appellant corporations, and on a conversation between the respondent and director Green, had subsequent to the meeting of December 23, 1910. The letters are lengthy and the testimony concerning the conversation occupies many pages of the record, and it would be unprofitable to review them at length. The letters undoubtedly show a desire on the part of the appellants to have Lord's services as a selling agent for their lands and show a willingness on their part to pay him a regular agent's commission on all sales made by him, but we are unable to find in them anything supporting the contention that the respondent was substituted as selling agent in lieu of the agents named in the agreement. They were letters such as would be sent to any agent. They stated the conditions which an agent must comply with in making sales, and distinctly stated that the commissions would be five per cent. This, also, as we have before stated, is the commission tendered the respondent on the receipt of the report of the first sale. True, counsel say

of this tender, that it "undoubtedly discloses another of the smooth tricks of" the president of the corporations "in an attempt to 'slip one over' on Lord," but we see in it nothing more than the fulfillment of the agreement the appellants understood had been made with him.

The conversation between the respondent and Green, as testified to by the respondent, is in the main as follows:

"We had finished our luncheon by this time and Mr. Green said to me that he would like to talk with me, invited me to walk with him down to his office, asked if I had time and I told him I had plenty of time, I was there on that business only, and the party broke up. Mr. Green and I left the hotel together and we walked down to his office, down on some dock I believe it is, and we talked about this on the way down, that is, he talked a great deal to me; he said he hadn't known —he didn't know of the existence of this contract when he bought in there and that if it wasn't for the very friendly relation between himself and Mr. Backus or the Backuses that there would be some law on this matter, and he further said to me, he said, 'Now,' he says, 'Mr. Lord,' he says, 'we don't want to quarrel over this matter, I don't want to quarrel with you and you don't want to quarrel with us.' I said I certainly did not, I would like to have my commissions as they were earned and I was anxious to go ahead with the contract, and he says 'Now you do that,' he says, 'you go over there, we are ready to sell these lands, now you go over there and you just pitch into this work and show these people that you are just the man that they are looking for, and you may be just exactly the man we are looking for, the man that we want to handle that land, you may be the best man in the country, we don't know,' and he says 'you claim you have got a good contract, we say it is not a good contract; now you are entitled to your opinion and we are entitled to ours,' and he says, 'you do nothing that will in any way injure your contract, go over there and go to work, but don't do anything that will injure your contract in any way, and show us that you can sell these lands, we don't think you can.' I told him that I never expected to sell all those lands, didn't expect to when I signed the contract; and he says 'well, will you—you will go over there and go to work, will you?' I says 'I will go over there and go to work right under that

contract and I will do everything I can to sell the land and I will advertise in accordance with that contract, I will do everything that I agreed to do.' 'Well,' he says, 'you think it is a good contract, we think it is not, so there we are; go ahead and show us that you are the man for the place over there.' And that was about the—that is about the sum and total of the conversation as I remember it at this time."

And at a subsequent meeting in the presence of directors Green, Swalwell and Backus:

"Well, they told me at that time that they did not owe me anything at all, didn't owe me a cent, and I remember very distinctly that Mr. Green said to me that—he says 'You have threatened to sue us and that was no way to do, that wasn't the right way for you to do.' I said 'Mr. Green, it is just the reverse, you have told me that if I got anything from this company that I would have to sue to get it,' and he says 'If you want—' he says, 'if you want us to, then go ahead and sue,' he says, 'we will have a nice friendly lawsuit,' he says, 'if we lose, why, we will pay of course, there isn't any use to fall out about it; if you think you have got a claim against us, why, go ahead and sue us, it can be a nice friendly affair, if you can collect, all right, we will pay, we are able to pay.' And he turned to Mr. Joe Swalwell—I remember this distinctly—he turned to Joe and he says 'That is the proper way to get it isn't it, Joe?' and Joe says 'I think there is better ways than that,' or words to that effect; but they made it very clear to me at that time that if I got anything that I had to sue to get it. Now, I didn't argue very much with those people at that meeting or any other, except to demand what I thought was coming to me and I insisted on it; of course it was owing me."

The version given by Green differs materially from the respondent's but conceding the latter's version to be true, we think it falls far short of justifying the conclusion that the appellants ratified the assignment of Brown's interest in the original agreement to the respondent, or substituted the respondent as sales agent under the agreement in the place and stead of the persons named therein.

The appellants assign error on the refusal of the court to permit them to introduce evidence in support of their second affirmative defense. The nature of this defense we have heretofore sufficiently indicated. The claim of error is founded on the contention that the agreement of the brokers to procure assignments of the named portions of allotments 8 and 10 was absolute, and for a breach thereof they are entitled to counterclaim in damages. The agreement, in our opinion, will not bear this construction. Without further analysis of its provisions, we think it nothing more than the employment of brokers to negotiate on behalf of the employers for the purchase of certain specified lands, and that the brokers fulfilled their part of the contract when they in good faith used their best endeavor to procure the property. This is the natural construction of the contract when considered with reference to the services to be rendered, and is emphasized by the clause therein wherein it is agreed to pay stated commissions even though the land be procured through other sources than the efforts of the brokers.

We conclude, therefore, that the respondent is entitled to recover the sum of $6,000 as commission for the purchase of allotments 8 and 10; the sum of $90 as a commission on the sale to McCarten; the sum of $70.60 as a commission on the sale to Finch, with interest at the legal rate on the first and last mentioned sums from the date the same became due and payable. The judgment is reversed, and remanded with instructions to enter judgment accordingly.

CROW, C. J., MOUNT, MORRIS, and PARKER, JJ., concur.